**CITY OF HOUSTON et al. v. STATE ex rel. CITY OF WEST UNIVERSITY PLACE et al.**

**No. 11465.**

Court of Civil Appeals of Texas. Galveston.

Jan. 7, 1943.

Rehearing Denied May 6, 1943.

Lewis W. Cutrer, Ernest H. Folk, Lester Settegast, and Harry G. Dippel, all of Houston, for appellants.

Gerald C. Mann, Atty. Gen., and Dan W. Jackson, Criminal Dist. Atty., A. J. Lamonte, City Atty., and W. Ray Scruggs, Sp. Counsel, all of Houston, for appellees.

CODY, Justice.

This proceeding is in the nature of a quo warranto, brought by the Attorney General of Texas and the District Attorney of Harris County upon the relation of the City of West University Place, its mayor and commissioners, against the City of Houston, etc. The relief sought was a degree adjudged that the act of the City of Houston in annexing land so as to effect a complete bottling up of the City of West University Place, whereby the right of the City of West University Place to exercise a like right of annexing land in the future was destroyed, was void.

Both cities are organized under the Home Rule provision of the State Constitution, and its enabling act. The City of Houston has developed into an industrial city: In 1850 its population was less than 2,400; in 1900 its inhabitants exceeded 44,000; in 1910 they exceeded 75,000; in 1920 they exceeded 138,000; in 1930 they exceeded 292,000; in 1940 they equaled 384,514. The figures given apply only to persons residing within the corporate limits of Houston. J. V. Goodwin testified that Houston population residing within its corporation limits is now increasing more rapidly than any other industrial city in the United States— at the rate of 40,000 a year. Washington, D. C., is not regarded as an industrial city.

The City of West University Place is a residential city located within the metropolitan area of Houston, which lies between Houston on the east and Bellaire—another residential city within Houston's metropolitan area—on the west. South Side Place, another residential city, also lies between Bellaire on the west and Houston on the east, and adjoins West University Place on its south boundary line. In fact, the corporation limits of West University Place on

the east coincide in part with, but are not so extensive as, the west corporate limits of the City of Houston. Also, any expansion by West University Place to the west was, prior to the time Houston acted, largely blocked by the location of Bellaire; though the accompanying map or plat will disclose that West University Place was for the distance of about a half a mile bounded on the west by the right-of-way of the Southern Pacific Railway, over and across which it might have expanded. But except

for this short out-let across the railroad right-of-way, land subject to annexation by West University Place lay only on its north and south. Indeed, this resulted from its being established between the sites of two cities, both older than it—Houston and Bellaire.

On December 9, 1940, the governing body of the City of Houston instituted proceedings to block any further encroachment by West University Place upon its metropolitan area. This proceeding took the form of an ordinance by the City of Houston extending its limits so that they touched upon and coincided with all of West University Place's corporation limits which were not theretofore bounded by the corporation limits of Houston, of Bellaire, and of South Side Place. That the primary design of the governing body of the City of Houston was to block any further encroachment by the City of West University Place upon its metropolitan area is disclosed by referring to the accompanying plat. It will be noted, among other things, that the ordinance embraced upon the western side of West University Place the Southern Pacific right-of-way only—a strip of land approximately 100 feet wide and a half a mile long. The City of Houston was so far from making any pretense that its purpose was not to block any further encroachment by the City of West University Place upon its metropolitan area, that it proclaimed such purpose and sought to introduce evidence to prove such step was necessary self-defense. The Court declined to admit any such evidence.

Now the power of a Home Rule City to fix its boundaries is the power to legislate. Prior to the adoption of the Home Rule Amendment to the State Constitution, the Legislature could fix or alter the boundaries of an incorporated city, and it was held in Graham v. City of Greenville, 67 Tex. 62, 2 S.W. 742, that such power was not restricted by the State Constitution. The Home Rule Amendment took this legislative power from the Legislature and conferred it upon cities which adopted a Home Rule Charter. Of course, in altering their boundaries cities must observe the procedure prescribed by the enabling act (which, so far as material, we hereafter quote). See Note in 64 A.L.R. 1341. Steinhagen v. Eastham, Tex.Civ.App., 233 S.W. 660; Id., 111 Tex. 597, 343 S.W. 457; Hunt v. Atkinson, Tex.Com.App., 17 S.W.

2d 780; Id., Tex.Com.App., 18 S.W.2d 594. This power of a Home Rule City to annex territory, being legislative power, is therefore not subject to being revised by the judicial power of the courts. See City of Gladewater v. State, 138 Tex. 173, 157 S.W.2d 641; State v. City of Waxahachie, 81 Tex. 626, 17 S.W. 348; Norris v. City of Waco, 57 Tex. 635. We are not therefore concerned with the motives of the governing body in undertaking to annex territory which completely blocked off the City of West University Place from access to its metropolitan area. Our only concern is, firstly, did it have the legal power to annex such territory, and, secondly, did it take the steps essential to a valid exercise of such power? To determine the answers to these questions we must examine the provisions of the Home Rule Amendment to the Constitution, and the pertinent provision of the enabling act, and of the City Charter.

Article 11, § 5, of the Constitution, Vernon's Ann.St., provides: "Cities having more than five thousand [5,000] inhabitants may, by a majority vote of the qualified voters of said city, at an election held for that purpose, adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature and providing that no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution * * * or of the general laws * * * of this State." The enabling act (Art. 1175) provides: "Cities adopting the charter or amendment hereunder shall have full power of local self-government, and among the other powers that may be exercised by any such city the following are hereby enumerated for greater certainty". And Section 2 thereunder reads: "2. The power to fix the boundary limits of said city, to provide for the extension of said boundary limits and the annexation of additional territory lying adjacent to said city, according to such rules as may be provided by said charter." It is quite obvious that the legislative power to fix boundaries possessed by one Home Rule city may operate as a limitation upon the legislative power of another Home Rule city to alter boundaries. In an opinion adopted by the Supreme Court, the Commission of Appeals held in City of Houston v. City of Magnolia Park, Tex.Com.App., 276 S.W. 685, 689, "We do feel that the courts should be slow

to deprive one home rule city of its rights in favor of another home rule city. They are supposed to be of equal dignity. At any rate, they are equal under the provisions of our Constitution." And, of course, they are equally entitled to the benefit of the provisions of the enabling act. In the Magnolia Park case, Houston was attempting to annex the territory of the City of Magnolia Park, under authority of the Legislature, before the City of Magnolia Park had qualified as a Home Rule City, but after it had more than the number of citizens necessary to adopt a Home Rule Charter. Said the Court, 276 S.W. on page 688: "The Legislature did not have the power to deprive Magnolia Park, or any other such city, of its right to adopt and amend its own charter at any time after it had more than 5,000 inhabitants. Under the act, its very existence could be wiped out without its people having any voice in, much less entire control of, that question. The Legislature can limit the manner of adopting or amending a charter by a home rule city, but it cannot destroy that right." By the same parity of reasoning a Home Rule city by the exercise of its legislative power involved in annexing territory subject to annexation by a neighboring Home Rule city, may limit such neighboring Home Rule City in the exercise of the right to annex territory. Indeed, in such case it does necessarily limit the right to annex territory by removing the territory annexed from unappropriated territory. But one Home Rule city cannot lawfully destroy the right of another Home Rule city to annex any territory; for the right has been conferred by the Constitution and the enabling act. In this case, the governing body of the City of Houston deliberately, upon grounds which it thought proper, undertook to destroy the right of the City of West University Place to annex new territory, a right which the Legislature itself could not destroy, but which the Legislature has expressly provided for. We do not mean that the City of Houston could not have exhausted all of the territory available for annexation lying either to the north or to the south of West University Place; and the question is not before us of whether or not the governing body of Houston could not have exhausted all available territory both to the north and south of West University Place; but what we do mean is that, in this instance, to insure the complete destruction of any expansion right of West University Place, the governing body of the City of Houston undertook to annex a railroad right-of-way to the extent of some half a mile located on the west side of West University Place, thus completely confining that City within its present boundaries. Since the ordinance as a whole was thus aimed at and would have resulted in destroying the right of West University Place to extend its boundaries at all, it is void as a whole. Zweifel v. City of Milwaukee, 188 Wis. 358, 206 N.W. 215. As we must affirm the judgment of the trial court for the reasons given, we do not discuss the other points raised.

Affirmed.

## On Motion for Rehearing

The ordinance of annexation which we have held void contains a saving clause that "should· any section or part of this ordinance be held unconstitutional, illegal or invalid, such unconstitutionality, illegality or invalidity of such section or part shall in no wise affect, impair or invalidate the remaining portion thereof, but as to it the same shall be and remain in full force and effect." The rule with reference to saving clauses is thus stated in Corpus Juris, Vol. 59, page 647, Section 207: "A clause in an act declaring that if one section or provision of the act is unconstitutional the validity of the other sections or provisions shall not be affected is valid and will be given effect by the courts so far as possible or as justified by the terms thereof. Such clause has been held merely declaratory of the rules theretofore laid down by the courts, and will not be construed as requiring the court to uphold the valid part of any act where such part is wholly dependent on invalid parts, and cannot be given effect without them; it provides a rule of construction to aid in determining the legislative intent, and does not lay down an inexorable command." In our original opinion we held that, "Since the ordinance as a whole was aimed at and would have resulted in destroying the right of West University Place to extend its boundaries at all, it is void as a whole." If this is true, it was essential to accomplish such purpose that all of the territory embraced in the ordinance should be annexed to the City of Houston. "Where a munic-

208

ipal ordinance is entire, each part being essential to, and connected with, the balance, the invalidity of one part renders the whole invalid. The part that is good must be clearly distinguished from the part that is bad so that if the invalid portion is eliminated that which stands remains a distinct and complete ordinance capable of being enforced. The operation of the rule cannot be prevented by a provision in the ordinance that 'should any portion of this ordinance or contract be invalid, then so much thereof as shall not be invalid shall be and remain in full force and effect'." 45 C.J. 548. The ordinance under consideration is in its nature not severable, and must be sustained in its entirety if at all. This is readily seen by asking the question, how much of the territory attempted to be annexed shall be held to have been validly taken in, and where shall the excluded territory be cut from? Obviously, the answer can only be supplied by the governing body of the City of Houston. Courts, for instance, have the duty to set aside a railroad rate which is so unreasonable as to be confiscatory; but they have not the power to substitute in lieu of the rate which is set aside one which the court considers reasonable because the fixing of rates is exclusively a legislative function, just as the fixing of a city's boundaries is a legislative function. Just what part of the territory less than the whole of what the city has attempted to annex the governing body would wish to incorporate within the city limits we have no way of determining, only such governing body can determine this, for it involves the exercise of legislative powers. See County School Trustees v. District Trustees, 137 Tex. 125, 153 S.W.2d 434, 439.

The fact that the City of West University Place had not actually adopted a Home Rule Charter until some ten days after the City of Houston had begun its annexation proceedings on December 7, 1940, does not change the situation. It is not questioned that West University Place had a population greatly in excess of 5,000 on December 7, 1940. See City of Houston v. City of Magnolia Park, Tex.Com.App., 276 S.W. 685, cited in our original opinion.

Appellants' motion for rehearing is overruled.

Overruled.